**Robert J. HIRSH, Appellant,**

v.

**MARTINDALE–HUBBELL, INC., Appellee.**

**No. 81–5070.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 4, 1982.

Decided April 23, 1982.

Rehearing and Rehearing En Banc Denied June 15, 1982.

Erik O'Dowd, O'Dowd & Burke, Tucson, Ariz., for appellant.

Philip von Ammon, Feenemore, Craig, von Ammon & Udall, Phoenix, Ariz., for appellee.

Before ELY, HUG and ALARCON, Circuit Judges.

ELY, Circuit Judge:

Robert J. Hirsh, a practicing attorney, brought this antitrust action[1] challenging certain sales practices of Martindale-Hubbell [hereinafter "Martindale"] as violative of § 1 of the Sherman Act (15 U.S.C. § 1) and § 3 of the Clayton Act (15 U.S.C. § 14).[2] Upon the submission of cross mo-

---

1. Hirsh originally sought to bring this suit as a class action. Based upon the stipulation of counsel, however, application for class action status was withdrawn until after trial on the issue of liability.

2. Hirsh also contends that Martindale's sales practices violate § 2 of the Sherman Act (15 U.S.C. § 2). That claim, however, is still pending before the court below and is not presently before us.

tions for summary judgment, the District Court, 505 F.Supp. 114, concluded that no violation of those provisions of the antitrust laws had been established and entered summary judgment in favor of Martindale.[3] We affirm.

## I. FACTUAL BACKGROUND

Martindale publishes the *Martindale-Hubbell Law Directory* [hereinafter "the Directory"], the nation's leading annual directory of attorneys and the only directory of its kind expressly approved by the American Bar Association. The Directory, a multi-volume set, contains listings of virtually every American and Canadian lawyer as well as listings of a limited number of foreign attorneys.[4] Martindale distributes the Directory, both nationally and internationally, to attorneys, law firms, public agencies, private concerns, libraries, and schools.

In addition to its ABA approval, certain other attributes of the Directory render it a particularly attractive forum for attorney advertising. First, the Directory is one of the few law lists containing individual evaluations of the competence and ethics of the attorneys it lists.[5] Second, Martindale offers an attorney the opportunity to publish a broad range of information concerning his educational background and professional achievements.[6] Finally, certain sales practices of Martindale, discussed more fully below, tend to expand circulation of the Directory among attorneys. This expanded circulation greatly enhances the efficacy of advertising in the Directory.[7]

The Directory itself is divided into three sections: the geographic bar roster, the patent lawyer roster, and the biographical section. The geographic and patent lawyer rosters contain alphabetical listings, published without charge to the listed party, of individual attorneys and law firms.[8] Also contained in the geographic and patent lawyer sections are attorney advertisements known as "informative cards." Informative cards are available for purchase by any attorney or law firm, regardless of rating,[9] and contain information beyond that found in the individual listings.[10]

The biographical section of the Directory contains additional attorney advertisements known as "professional cards." Professional cards may be purchased only by attorneys and law firms meeting certain minimum ethical and competency standards, and contain information additional to that found in either the individual listings or the

**3.** Pursuant to Fed.R.Civ.P. 54(b), the District Court determined there was no just cause for delay and directed entry of summary judgment on the claims under § 1 of the Sherman Act and § 3 of the Clayton Act. These claims are therefore properly before us despite the fact that Hirsh's claim under § 2 of the Sherman Act is still pending below.

**4.** The Directory also contains information regarding the ABA, certain uniform laws, and the statutory laws of certain jurisdictions.

**5.** Martindale assigns letter values to attorneys based on information obtained from judges, other attorneys, and other sources in the community where the attorney practices. The highest attainable rating is "AV," with the "A" representing Martindale's evaluation of the attorney's legal skills and the "V" representing Martindale's evaluation of the attorney's ethics, reliability, and diligence.

**6.** An attorney may publish, *inter alia*, information concerning his areas of specialization,

membership in legal and honor societies, professional honors and awards, educational background, publications, and military service.

**7.** It appears that other attorneys are generally the most productive source of referrals.

**8.** These listings set forth the attorney's name, address, date of birth, and dates of undergraduate and law degrees.

**9.** In contrast, professional cards may be purchased only by attorneys and law firms rated "BV" or higher. *See* note 5 *supra*.

**10.** Informative cards contain information regarding the attorney or law firm such as the telephone number and zip code of the attorney or firm, names of partners and associates in the firm, areas of specialization, references, and representative clients.

informative cards. Certain information, however, may appear in both the informative and professional cards.[11]

Martindale imposes certain conditions upon the sale of professional and informative cards. First, attorneys wishing to purchase professional or informative cards are also required to purchase the Directory itself. [This requirement will be referred to as "the subscription requirement."][12] Second, only attorneys purchasing informative cards are permitted to purchase professional cards. Thus, in order to place a professional card in the Directory, an attorney must also purchase an informative card and subscribe to the Directory as well.

Under certain circumstances, however, Martindale sells the Directory and advertising separately. No advertising need be purchased in order to obtain the Directory itself. Furthermore, certain classes of attorneys, most notably foreign attorneys and attorneys sharing office space with a subscribing attorney, are permitted to advertise without purchasing the Directory.

Hirsh contends that these sales practices constitute two separate tying arrangements proscribed by § 1 of the Sherman Act (15 U.S.C. § 1) and § 3 of the Clayton Act (15 U.S.C. § 14).[13] According to Hirsh, the subscription requirement is an illegal tie-in, with the tying product being the advertising and the tied product being the Directory. Hirsh also contends that sales of informative cards (the tied product) are unlawfully tied to the sale of professional cards (the tying product).

Both Hirsh and Martindale filed motions for summary judgment in the District Court. The Court granted the motion of Martindale and denied that of Hirsh, holding, *inter alia*, that the functional interrelationship between the Directory and the advertising it contains precludes a finding they are legally separate products.[14] We agree.

## II. ANALYSIS

### A. *Standard of Review*

Hirsh appeals the entry of summary judgment in favor of Martindale. In evaluating the propriety of summary judgment, our review is identical to that of the trial court. *May Department Store v. Graphic Process Co.*, 637 F.2d 1211, 1214 (9th Cir. 1980); *Securities Exchange Commission v. Murphy*, 626 F.2d 633, 640 (9th Cir. 1980). Summary judgment is proper only where no genuine issue of material fact exists and the moving party is clearly entitled to prevail as a matter of law. Fed.R.Civ.P. 56(c); *May Department Store v. Graphic Process Co.*, 637 F.2d at 1214. In the present case, both parties state that there are no disputed issues of material fact. These statements are amply supported by the record. Accordingly, our review here is limited to a determination whether Martindale is entitled to judgment as a matter of law.

### B. *The Alleged Advertising-Directory Tie* [15]

■ In order to establish the existence of an unlawful tying arrangement, four elements must be proved. First, there must be two separate products involved, the sale

11. Areas of specialization, references, and lists of representative clients may appear in both the professional and informative cards.

12. As noted below, certain classes of attorneys are exempted from the subscription requirement.

13. Hirsh also contends that these practices violate § 2 of the Sherman Act (15 U.S.C. § 2). That claim, however, is not before us and we express no opinion regarding its merits. *See* note 2 *supra*.

14. The District Court also held that Hirsh's Clayton Act claim was barred because advertising is not a "commodity." *See* Clayton Act § 3 (15 U.S.C. § 14). Because we conclude that the advertising and the Directory are a single product, we need not consider the propriety of that ruling here.

15. Our analysis here applies to both the requirement that purchasers of informative cards purchase the Directory and the requirement that purchasers of professional cards purchase the Directory.

of one (the tying product) being conditioned upon the purchase of the other (tied product). *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 507, 89 S.Ct. 1252, 1260, 22 L.Ed.2d 495 (1969) (*Fortner I*); *Krehl v. Baskin-Robbins Ice Cream Co.*, 664 F.2d 1348, 1352 (9th Cir. 1982). Second, the seller must have engaged in some modicum of coercive conduct toward the buyer. *Moore v. James H. Matthews & Co.*, 550 F.2d 1207, 1216 (9th Cir. 1977). Third, the seller must possess economic power in the market for the tying product. *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Finally, a "not insubstantial" amount of commerce must be affected by the challenged aggregation. *International Salt Co. v. United States*, 332 U.S. 392, 396, 68 S.Ct. 12, 15, 92 L.Ed. 20 (1947).[16] Once these elements are established, a tying arrangement is presumptively illegal and will be prohibited without a specific showing of anticompetitive purpose or effect.[17] *Id.*

"There is, at the outset of every tie-in case, ... the problem of determining whether two separate products are in fact involved." *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 507, 89 S.Ct. 1252, 1260, 22 L.Ed.2d 495 (*Fortner I*). In determining whether an aggregation of items constitutes one or more products for antitrust purposes, we must look to the function of the aggregation. *Siegel v. Chicken Delight, Inc.*, 448 F.2d 43, 48 (9th Cir. 1971). This necessarily requires an inquiry into the nature of the relationship between the alleged tying product (the advertising) and the alleged tied product (the Directory). *Krehl v. Baskin-Robbins Ice Cream Co.*, 664 F.2d 1348, 1353. In evaluat-

ing this relationship, we must consider whether the aggregation serves to facilitate competition by promoting product quality or whether it, in fact, amounts to no more than a naked effort to impede competition on the merits. Our examination of the relationship between the items at issue here leads us to conclude that the Directory and the advertising it contains constitute but a single product.

Martindale offers advertising attorneys a system of legal advertising. The effective operation of that system requires both the printing of information regarding advertising attorneys and the circulation of that information. Through its subscription requirement, Martindale is able to supply both. To characterize the printing of the information and the circulation of that information as mere separable components of that system is to ignore the practical realities of advertising. *See Principe v. McDonald's Corp.*, 631 F.2d 303, 311 (4th Cir. 1980).

Generally, an attorney advertising in the Directory is seeking to obtain the referral of legal business through the dissemination of information regarding his legal qualifications. In order for this effort to succeed, the attorney's advertisement must reach those persons with legal work available for referral. Because other attorneys are frequently the most productive source of referrals, circulation of the Directory among them is particularly important. Through its subscription requirement, Martindale is able to offer prospective advertisers a guaranteed circulation among other advertising attorneys. Because circulation is one of the principal determinants of the value of specific advertising space, this guaranteed circulation greatly increases the desirability of

---

16. A minority of courts, however, require a showing of some sort of anticompetitive effect in the market for the tied product. *See, e.g., Driskill v. Dallas Cowboys Football Club, Inc.*, 498 F.2d 321 (5th Cir. 1974); *Coniglio v. Highwood Services, Inc.*, 495 F.2d 1286 (2d Cir.), *cert. denied*, 419 U.S. 1022, 95 S.Ct. 498, 42 L.Ed.2d 296 (1974).

17. Tie-ins differ from other *per se* illegal practices, however, in that, under certain circumstances, the tie may be legally justified. *See Dehydrating Process Co. v. A. O. Smith Corp.*, 292 F.2d 653 (1st Cir.), *cert. denied*, 368 U.S. 931, 82 S.Ct. 368, 7 L.Ed.2d 194 (1961).

advertising in the Directory and tends to spur sales of additional professional and informative card advertising. As more attorneys place advertisements in the Directory, the volume of information contained therein tends to expand. This increased information content renders the Directory itself a more effective tool for persons seeking to refer legal work to others and thereby tends to expand circulation of the Directory. This expanded circulation, in turn, renders advertising in the Directory more desirable by ensuring prospective advertisers a wider readership. From the foregoing, it is apparent that the aggregate sale of the Directory and the advertising it contains renders each more effective than if only sold separately. We believe this synergistic interrelationship between the Directory and the advertising precludes a finding that they are separate products. "Here, the whole is truly greater than the sum of its parts; it is . . . a different product." *Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 21–22, 99 S.Ct. 1551, 1563, 60 L.Ed.2d 1 (1978). Accordingly, we hold that where, as here, the aggregate sale of ostensibly separate items serves to improve the quality of the product offered by the seller, in the present case, advertising, no tying arrangement is present.

We believe that our holding here is consistent both with the policies underlying the prohibition of tying arrangements and the previous decisions of this court. We have long recognized that the rules governing tying arrangements are designed to strike solely at practices employed to impede competition on the merits. *Siegel v. Chicken Delight, Inc.*, 448 F.2d 43, 47. Martindale's subscription requirement is clearly not such a practice. Through the improved product quality resulting from the subscription requirement, Martindale is enabled to compete more effectively in the market for legal advertising.

■ Hirsh assails the subscription requirement as anticompetitive because it tends to improve Martindale's position in both the market for legal advertising and the market for law directories. This contention is based on a misconception of the operation of the competitive market system and the policies supporting the legislative preference for that system. Manifestly, Martindale's subscription requirement serves to increase the value to consumers of both the Directory and the advertising it contains. This improved product quality would necessarily tend to expand Martindale's market share.[18] The antitrust laws, however, are not intended to strike at all practices tending to improve a firm's market position. *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 243-44, 62 L.Ed. 683 (1918). Rather, they are designed to strike solely at the use of illegitimate means to obtain that end. *Id.* Clearly, practices employed to increase the efficacy of a firm's product are not such illegitimate means. Indeed, a major goal of the antitrust law is to promote such practices.

Moreover, the policies underlying the preference for a competitive market system support our result here. A competitive market system is preferred largely because of the widely held belief that competition promotes consumer welfare. *See* Markovits, *Tie-Ins and Reciprocity: A Functional, Legal and Policy Analysis*, 58 Texas L.Rev. 1363, 1414 (1980). In the present case, Martindale's subscription requirement tends to promote the welfare of consumers by increasing the effectiveness of both the Directory and the advertising. Under these circumstances, the tie-in doctrine can have no application. *See Dehydrating Process Co. v. A. O. Smith Corp.*, 292 F.2d 653, 655 (1st Cir.), *cert. denied*, 368 U.S. 931, 82 S.Ct. 368, 7 L.Ed.2d 194 (1961).

■ It is noteworthy that the evils normally associated with unlawful tying ar-

---

**18.** Martindale's sales of advertising have increased steadily in the past. According to at least one commentator, this is indicative of a pro-competitive effect in the market for legal advertising, the alleged *tying* product. *See* Posner, *The Next Step in the Antitrust Treatment of Restricted Distribution: Per Se Legality*, 48 U.Chi.L.Rev. 6, 21 (1981).

rangements are conspicuously absent from the case at bar. Tying arrangements are viewed with disfavor principally for two reasons.[19] First, tying arrangements are prohibited because they are thought to facilitate price discrimination. *Moore v. James H. Matthews & Co.*, 550 F.2d at 1213. Where the quantity of sales of the tied product operates as a measure of the buyer's intensity of use of the tying product, the seller may exact a premium from the more intensive users by charging supracompetitive prices for the tied product.[20] The possibility of price discrimination is clearly not present here: Regardless of the amount or type of advertising purchased, the buyer need only purchase one set of the Directory. Moreover, it is undisputed that Directory sales are not profitable. Thus, it is clear that Martindale is not charging supracompetitive prices for the alleged tied product, the Directory.

A second reason for the law's harsh treatment of tying arrangements is the belief that tie-ins may erect artificial barriers to entry by requiring potential competitors to enter two separate product markets simultaneously.[21] *Fortner I*, 394 U.S. at 513, 89 S.Ct. at 1263 (White dissenting). This consideration is clearly not relevant here. Because the advertising is physically contained within the Directory, potential competitors would necessarily be compelled to produce both regardless of Martindale's sales practices.[22]

Because of the synergistic interrelationship existing between the Directory and the advertising, and because the plain effect of the subscription requirement is to promote rather than impede competition, we conclude that the aggregate sale of the *Martindale-Hubbell Law Directory* and the advertising contained therein does not constitute an unlawful tying arrangement.

### C. The Alleged Professional Card-Informative Card Tie

■ As noted above, Martindale sells professional cards only to attorneys who also purchase informative cards. Hirsh contends that this requirement operates as

---

**19.** Two additional reasons have been asserted in support of the antitrust law's harsh treatment of tying arrangements. First, it has been argued that tying arrangements permit sellers with monopoly power in the tying product market to extend this monopoly power into a second market. *See, e.g., International Salt Co. v. United States*, 332 U.S. at 396, 68 S.Ct. at 15. This, the so-called "leverage theory," has been largely discredited by economists, primarily because modern economic thought indicates that all available monopoly profits could be obtained from the tying product alone without the use of a tie-in. *See* R. Bork, *The Antitrust Paradox*, 373 (1978). Second, tying arrangements are disfavored because they intrude upon consumers' freedom of choice by compelling the purchase of unwanted products. *See, e.g., Moore v. James H. Matthews & Co.*, 550 F.2d at 1212-13. This rationale has been implicitly rejected by the Supreme Court as a sufficient independent basis for antitrust liability. *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 53 n.21, 58 -59, 97 S.Ct. 2549, 2559 n.21, 2561-2562, 53 L.Ed.2d 568.

**20.** For a more complete discussion of how tying arrangements facilitate price discrimination, *see* Markovits, *supra*, 58 Texas L.Rev. at 1378-80.

**21.** At least one commentator, however, has suggested that tying arrangements do not necessarily erect barriers to entry. *See* Markovits, *supra*, 58 Texas L.Rev. 1363, 1419-22 (1980).

**22.** Hirsh places great weight on the fact that, under certain circumstances, Martindale sells the advertising and the Directory separately. Hirsh contends that these separate sales establish that the Directory and the advertising contained therein are separate products. We disagree. Martindale sells advertising separately only to foreign attorneys and attorneys sharing office space with a subscribing attorney. Because foreign attorneys are less likely to refer legal work to domestic attorneys, and, because attorneys sharing office space with a subscribing attorney already have access to the Directory, application of the subscription requirement to them would serve no valid purpose. Thus, Martindale's policy of excepting these attorneys from the subscription requirement constitutes a reasonable effort to limit application of the requirement to those situations where it would effectuate its underlying purpose. We fail to see how such a limitation can render an otherwise permissible practice unlawful.

an unlawful tying arrangement. We disagree.

The existence of separate markets for the alleged tying and tied products is crucial to a finding of an unlawful tying arrangement. *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 614, 73 S.Ct. 872, 883, 97 L.Ed. 1277 (1953); *Moore v. James H. Matthews & Co.*, 550 F.2d at 1214; *Washington Gas Light Co. v. Virginia Electric & Power Co.*, 438 F.2d 248, 253 (4th Cir. 1971). Absent the existence of separate markets, the alleged tying and tied products are, in reality, but a single product. Hirsh failed to establish here the existence of separate markets for informative and professional card advertising. Accordingly, we conclude that the informative and professional cards are not separate products and their aggregate sale does not constitute an unlawful tying arrangement.

In *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277, the defendant published two separate newspapers. Advertisers were permitted to purchase only combined insertions appearing in both newspapers and were not permitted to advertise separately in either. *Id.* at 596–97, 73 S.Ct. at 874. The Supreme Court upheld this requirement against a challenge that it constituted an unlawful tying arrangement. Central to the Court's holding was a determination that the readership of both newspapers was identical and therefore separate markets did not exist. The case at bar is indistinguishable.[23]

An examination of the competitive situation confronting Martindale in its efforts to sell professional and informative cards leads inescapably to the conclusion that separate product markets do not exist. In the generic sense, both professional and informative cards constitute "legal advertising." Both appear in the same Directory and operate to generate legal referrals by disseminating information regarding advertising attorneys. Both reach identical audiences. Moreover, in marketing professional cards, Martindale is confronted by the very same competitors it faces in selling informative cards. We therefore conclude that Hirsh had simply failed to establish that the professional and informative cards are the type of "generically distinct" items necessary for a finding of an unlawful tying arrangement. *See Moore v. James H. Matthews & Co.*, 550 F.2d at 1214.

An evaluation of the competitive impact of the sales practice at issue here supports our conclusion. Because both informative and professional cards are sold in the market for legal advertising, there is no danger to competition on the merits: Prospective advertisers are free to evaluate the value of advertising space offered by Martindale against that offered by its competitors. *See Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545. Further, because professional and informative cards are sold in fixed proportion, *see Siegel v. Chicken Delight, Inc.*, 448 F.2d 43, 48, no danger of price discrimination is presented by the challenged aggregation. Nor is the antitrust law's concern with the prevention of the creation of artificial barriers to entry implicated here.[24] In order to compete effectively with Martindale, potential competitors need only develop a system for attorney advertising equal or superior to that offered by Martindale. Under these circumstances, we conclude that the aggregate sale of professional and informative cards does not constitute an unlawful tying arrangement.

## III. CONCLUSION

We have considered Hirsh's remaining contentions and find them unworthy of dis-

---

23. Indeed, the facts of the present case are even stronger in support of a finding that no unlawful tying arrangement exists. In *Times-Picayune*, the advertising appeared in two separate newspapers, an afternoon edition and a morning edition. Thus, at least a plausible argument existed that there were separate markets involved. In the present case, no such argument exists because both advertisements appear in the same Directory.

24. The analysis here is identical to that employed above in evaluating the subscription requirement.

cussion. Our analysis of the sales practices at issue here leads us to conclude that Hirsh has failed to establish the existence of any unlawful tying arrangement. In particular, we hold that the *Martindale-Hubbell Law Directory* does not constitute a product separate from the advertising it contains. We further hold that the professional and informative cards do not constitute separate products for the purposes of the antitrust laws.[25] Accordingly, the judgment of the District Court is

AFFIRMED.

---

**25.** Nothing contained in this opinion is to be construed as expressing any view on the merits of Hirsh's pending claim under § 2 of the Sherman Act.

